IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL WERT,

    Plaintiff,                              No. CIV S-05-2100 GGH

    vs.

MICHAEL J. ASTRUE,[1]                  ORDER
Commissioner of
Social Security,

    Defendant.
                                      /

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is granted, the Commissioner's Cross Motion for Summary Judgment is denied, this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for a computation of benefits, and the Clerk of Court is directed to enter final judgment.

\\\\\

\\\\\

---

[1] Michael J. Astrue became Commissioner on February 12, 2007. Accordingly, he should be substituted as defendant in this suit. Fed. R. Civ. P. 25(d)(1). No further action need be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

BACKGROUND

Plaintiff, born September 17, 1958, applied for disability benefits on April 25, 2003. (Tr. at 41.) Plaintiff alleged he was unable to work since July 27, 2000, due to a herniated disc, cervical spine impairment, and degenerative disc disease. (Id., 16.) In a decision dated April 6, 2005, ALJ Mark C. Ramsey, determined that plaintiff was not disabled.[2] The ALJ made the following findings:

> 1. The claimant has not performed any substantial gainful activity since July 27, 2000.
>
> 2. The claimant's impairments which are considered to be "severe" under the Social Security Act are degenerative disc disease [and] depression.
>
> 3. The claimant's impairment does not meet or equal in severity the appropriate medical findings contained in 20

---

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

                CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).

4.    On, and after January 5, 2005, the claimant's allegations are found to be credible.

5.    On, and after January 5, 2005, the claimant's impairments prevent him from performing the demands of sustained and ongoing sitting, standing, and walking. The claimant cannot lift more than minimal amounts of weight, and he must be given the opportunity to rest at will. The claimant is limited to simple, repetitive tasks. On, and prior to December 31, 2000, the claimant was limited to light work.

6.    The claimant cannot perform his past relevant work.

7.    The claimant was 46 years old on the date disability began, which is defined as a younger individual. The claimant has a 12th grade education.

8.    The claimant does not have transferable skills to work within his residual functional capacity.

9.    Based upon the claimant's residual functional capacity, and vocational factors, on, and after January 5, 2005, there are no jobs existing in significant numbers which he can perform. This finding is based upon the framework of Medical-Vocational Rule 201.21. 20 CFR Part 404, and Appendix 2 to Subpart P. However, on and prior to December 31, 2000, Rule 202.21, Appendix 1, Subpart P, Regulations No. 4, directs that the claimant is not disabled as there are a significant number of jobs that the claimant can perform.

10.   The claimant has been under a disability as defined by the Social Security Act and Regulations on, but not prior to, January 5, 2000.[3]

(Tr. at 19-20.)

ISSUES PRESENTED

        Plaintiff has raised the following issues: (A) Whether the ALJ Failed to Consider All Plaintiff's Impairments Under Step Two of the Analysis; (B) Whether the ALJ Failed to Credit Plaintiff's Testimony Regarding His Pain and Functional Limitations; and; (C) Whether

---

[3] This date is a typographical error. The body of the opinion states that plaintiff was disabled as of January 5, 2005.

3

the ALJ Erred in Applying the Grids Despite the Existence of Significant Nonexertional Limitations Rather than Utilizing a Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

A. Whether the ALJ Failed to Consider All Plaintiff's Impairments Under Step Two of the Analysis

Plaintiff claims that not only did the ALJ fail to articulate any severe impairments,[4] he failed to evaluate the severe impairments of spondylosis, cervical strain, soft tissue trauma, mid-back strain, trapezius strain, cervical nerve root inflammation, increased sensitivity to pain, spinal disc narrowing, loss of proper spinal curvature, multilevel cervical disc disease, cervical discogenic pain, neck pain, back pain, shoulder pain, arm pain, and head pain.

\\\\\

---

[4] Plaintiff elsewhere states that the ALJ did find the severe impairment of degenerative disc disease depression. (Plaintiff's Mot. at 7; tr. at 19.)

4

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). At this step, the ALJ may decline to find a severe impairment "*only* if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).

The ALJ only found severe plaintiff's degenerative disc disease and depression, and did so only in his formal findings. (Tr. at 19.) Defendant correctly notes that many of the ailments on plaintiff's list of severe impairments are only symptoms, not impairments. Plaintiff can only establish an impairment if the record includes signs – the results of "medically acceptable clinical diagnostic techniques," such as tests – as well as symptoms, i.e., plaintiff's representations regarding his impairment. Ukolov v. Barnhart, 420 F.3d 1002, 1004-1005 (9th Cir. 2005). For example, pain in various areas is a symptom only, not a diagnosable impairment.

Other impairments did not last long enough to be considered severe impairments. For example, plaintiff was diagnosed with mid-back strain only once, according to plaintiff's summary of the medical records, on August 11, 2000. (Tr. at 363.) Plaintiff was also diagnosed with trapezius strain only a couple of times. (Id. at 327, 360, 258.) These conditions did not appear to endure for any significant length of time.

Other claimed impairments are severe, however. Plaintiff points to pre-2005 medical records such as Dr. Jorde's, which include diagnoses. On July 31, 2000, plaintiff was diagnosed with cervical strain as a result of an accident at work in which he fell backward six feet from a ladder onto a retaining wall, hitting his head and neck. He was able to move after

about thirty minutes to an hour.  (Tr. at 365, 368, 436, 327.)  Plaintiff was told not to return to work at this time.  (Tr. at 365.)  On August 3, 2000, plaintiff was diagnosed with soft tissue trauma and cervical strain, and told to remain off work.  Plaintiff would be told not to return to work for several months, from the time of his accident until at least October 9, 2000.  (Tr. at 356-66.)  Plaintiff was seen every one to two weeks over a period of a few months, and the diagnoses were similar each time.  (Tr. at 361, 360, 330-31.)  On September 26, 2000, Dr. Tate suspected cervical radiculitis and recommended steroid blocks.  Dr. Tate did not think plaintiff was a surgical candidate at that time. (Tr. at 368-69.)   On November 21, 2000, plaintiff saw Dr. Lam to get a second opinion.  He diagnosed cervical spondylosis based on plaintiff's MRI and examination.  (Tr. at 436.)

Although after the date last insured, the following records are close enough in time to be relevant to that period.  Dr. Soloniuk saw plaintiff on March 5, 2001, and diagnosed multilevel cervical disc disease, with significant pain, as well as depression secondary to the prolonged pain and disability.  Plaintiff was not responding to conservative management. (Id. at 267-68.)  This physician at Advanced Pain Care Medical Clinic treated plaintiff since March, 2001, seeing him approximately once per month, and prescribing various pain medications.  On June 12, 2001, he diagnosed cervical degenerative disc disease, multilevel, and adjustment reaction disorder due to the pain.  (Tr. at 258.)

These records indicate that plaintiff had additional severe impairments of spondylosis and multilevel cervical disc disease.  Although related to degenerative disc disease, these are separate impairments and the ALJ erred in not finding them so.

B.  Whether the ALJ Failed to Credit Plaintiff's Testimony Regarding His Pain and Functional Limitations

Plaintiff asserts that the record does not support ALJ's finding that plaintiff was not fully credible, or that his daily activities showed he could work.

\\\\\

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[5] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent

---

[5] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

7

affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

In this case, the ALJ noted that although initially plaintiff could not participate in physical therapy due to the pain, he admitted that symptoms grew progressively worse since his alleged onset date. (Tr. at 17.) It is true that plaintiff stated his condition worsened in the four years prior to the hearing; however, there is no event or diagnosis of a condition occurring in the intervening period which would have caused a deterioration in plaintiff's condition after his work accident.[6] This is not the case where an initially mild injury, not disabling, became so because of sudden deterioration or intervening traumatic event. In fact, plaintiff testified that he suffered no injury subsequent to the July, 2000 accident. (Tr. at 463.) Being presented with a finding that plaintiff was disabled as of January, 2005, the court is bound to determine whether there was any intervening circumstance which would explain lack of disability in December, 2000, and the record does not reveal one. It is difficult to comprehend from this record how plaintiff's condition could have significantly worsened over the four year period as a result of not working, staying home, and resting, if it was non-disabling at the start.

Rather, the picture here was one of an initial traumatic event, causing severe injuries, which not surprisingly, took some time to finally prognosticate from a medical standpoint. It is unrealistic to expect that certain, unchanging medical opinions about the severity of an injury will always be immediately available and rendered given the uncertainty that accompanies the ability of humans to heal from injury. The picture here was one of a person attempting to recover from an injury, doctors working to that uncertain end, with an ultimate non-success. However, it is error to automatically equate uncertainty of recovery with an ability

---

[6] Plaintiff was later diagnosed with "adjustment reaction pain related with significant depression and anxiety," which was as a result of his physical problems, and probably explains plaintiff's statement of worsening over time. (Tr. at 256.)

to work. Moreover, pain which worsens over time does not necessarily mean that it was mild or merely bothersome to begin with – initially disabling pain can get worse.

In fact, Dr. Baker, an orthopedist, attributed plaintiff's residual disability in 2004 to the accident in July, 2000. (Tr. at 433.) The medical records during the date last insured period indicate that plaintiff 's condition was seriously disabling, just as it was in 2005. In the months following the accident, Dr. Jorde ordered that plaintiff not return to work and not go to physical therapy. (Tr. at 356-59.) Plaintiff was eventually referred to physical therapy on August 26, 2000, but directed not to return to work. (Id. at 362.) Although plaintiff missed most of his physical therapy appointments, he explained that he was in too much pain at that time. (Tr. at 465.) Plaintiff testified that he tried to do some of the therapy but was unable. The physical therapist told him that he was in no shape to do the therapy. (Id. at 464.) The physical therapist who initially evaluated him noted that all the signs and symptoms were consistent with cervical spine spondylosis and marked nerve root irritability. (Tr. at 328.)

On September 26, 2000, Dr. Tate thought plaintiff probably had cervical radiculitis. (Id. at 368.) The MRI of September 12, 2000, indicated degenerative changes which were chronic for the most part, but no acute stenosis or herniation. (Id.) The recommended plan was epidural steroid blocks. At that point in time, Dr. Tate thought plaintiff could eventually return to work without surgery. (Id. at 369.) Defendant points to Dr. Tate's suggestion that plaintiff did not appear to have given a good effort during testing (Tr. at 368); however, the later finding of disability in 2005 disproves this opinion, as does Dr. Soloniuk's later opinion that physical therapy would only serve to flare things up. (Tr. at 235.)

On November 21, 2000, plaintiff saw Dr. Lam, a spine specialist, for a second opinion. The diagnosis was cervical spondylosis. His review of the same MRI indicated disc dessication at all cervical levels, mild disc narrowing at C4-5, moderate to moderately severe disc narrowing at C5-6 and C6-7, loss of cervical lordosis, but no significant central stenosis. (Id. at 436.) Dr. Lam recommended an EMG, nerve conduction study, physical therapy and epidural

steroid injections. (Id. at 437.)

Records after plaintiff's date last insured reflect the severity of his condition and do not show any intervening circumstance which would have worsened it. The records show for the most part that plaintiff and his treating sources were trying various treatments, all to no avail. Plaintiff was referred for physical therapy twice, in September and December, 2000, but was unable to tolerate it due to the pain. (Tr. at 330, 326, 465.) On June 12, 2001, Dr. Soloniuk discussed plaintiff's options with him after discography which showed multilevel cervical degenerative disc disease. (Id. at 258.) He opined that surgery was high risk, and that it might not go well, or that it would provide only partial relief of his pain. The only other options available to plaintiff were medication and psychological intervention for long term pain control.[7] (Id.)

On February 13, 2002, Dr. Soloniuk's report was enlightening. Although previous reports indicated that plaintiff missed many of his previous physical therapy appointments, this physician opined that physical therapy at this point would only "flare things up." (Tr. at 235.) He thought instead that pool therapy would offer plaintiff general conditioning and improve his chances for a successful surgery. His caveat, however, was that plaintiff had become "terribly deconditioned over the last year and a half, and this lessens his chance for a good surgical outcome." (Id.)

Plaintiff then had discography on September 27, 2002. There were fissures at C2-3-4-5, 6-7 which were painful. Fissures at C5-6 were not painful. (Id. at 163.) At this point,

---

[7] As can be seen from later records, serious pain medications were employed to reduce the pain. Dr. Soloniuk tried the following medications, but many of them did not help: Celebrex, Duragesic, Norco, Methadone, Oxycontin, Sonata, Vioxx, Mobic, Percocet and Hydrocodone. (Id. at 213-14, 252, 254, 256.) Also prescribed were Effexor and Celexa, to treat major depression. (Id.) On January 7, 2004, plaintiff was diagnosed with cervical disc displacement without myelopathy and adjustment reaction related to pain. (Tr. at 132.) At this point in time, he recommended continuing medication for pain, and steroid injections for acute control of pain. (Id. at 133.) On November 4, 2004, this physician opined that plaintiff had chronic, severe intractable pain, qualifying him for treatment with opioids. (Id. at 334.)

plaintiff was determined not to be a good surgical candidate. (Id. at 164, 165.)  On April 8, 2003, MRI of the brachial plexus was normal, but a cervical MRI showed multilevel tears with myofacial pain and spasms. (Id. at 167.)

In analyzing plaintiff's credibility, the ALJ stated that plaintiff reported no side effects from Vicodin and Soma; however, plaintiff testified that he experienced "quite a bit" of side effects from his medication. (Tr. at 18, 465.)  Furthermore, these medications are usually prescribed for moderate to moderately severe or acute pain. www.pdrhealth.com.  The ALJ also blamed plaintiff for not going through with an epidural injection; however, plaintiff stated he wanted a second opinion before proceeding, and that is why he saw Dr. Lam. (Id. at 18, 436.)

For the aforementioned reasons, the ALJ's credibility finding is not supported by substantial evidence.

C. Whether the ALJ Erred Applying the Grids Despite the Existence of Significant Nonexertional Limitations Rather Than a Vocational Expert

Plaintiff contends that the ALJ should have utilized a vocational expert based on his nonexertional limitation of pain.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience.  At the fifth step of the sequential analysis, the grids determine if other work is available. See generally Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional capabilities.[8]  Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds,

---

[8] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling. 20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper,

11

Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  See Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience, education, and psychological and physical impairments to determine whether a nonexertional limitation significantly limits plaintiff's ability to work in a certain category.  Desrosiers 846 F.2d at 578 (Pregerson, J., concurring).  "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such a case, the guidelines would be inapplicable."  Desrosiers, 846 F.2d at 577-78.  The ALJ is then required to use a vocational expert.  Aukland v. Massanari, 257 F. 3d. 1033 (9th Cir. 2001).

        In this case, the ALJ found that after January 12, 2005, plaintiff could only lift minimal weight, had to rest at will, could not sit, stand or walk on a sustained basis, and could only do simple repetitive tasks.  (Tr. at 18.)  However, using the grid chosen by the ALJ on plaintiff's age of 46 years at that time, and a 12th grade education, there were jobs plaintiff could do based on Rule 201.21 of the grids.  (Id. at 19.)  This rule requires a decision of "not disabled," and is an inexplicable error by the ALJ.  It is unclear why the ALJ picked this rule to begin with, as his discussion pertaining to the post 2005 period finds that plaintiff cannot do any work, and this rule of the grids pertains to sedentary work.  This error, coupled with the typographical error in the formal findings, as well as the ALJ's misrepresentation of plaintiff's testimony regarding side effects of his medications (Tr. at 18, 465), leads the court to question how carefully the case was analyzed.

        In any event, prior to December 31, 2000, the ALJ found that plaintiff could do the full range of light work based on the objective medical evidence during that time period

---

880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).  "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

which showed no radiculopathy or neurological involvement. (Id.) In fact, on November 21, 2000, Dr. Lam had recommended an EMG and nerve conduction study to rule out radiculopathy versus peripheral neuropathy. (Tr. at 437.) It is not explained how the ALJ arrived at the determination that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, and stand or walk for six hours in a work day, as the records do not reflect a residual functional capacity assessment during this time period. For these same reasons, it is also unclear how the ALJ arrived at the assessment of light work as opposed to any other category, such as sedentary or medium work. In fact, the records during this period specifically state that plaintiff cannot work between July, 2000 and October, 2000. (Tr. at 355-66.) Although Dr. Tate predicted that plaintiff should be able to return to work in the future, this opinion was a prediction only, which was never realized.

Furthermore, this court's previous conclusion of error in the ALJ's findings that plaintiff was not fully credible prior to December 31, 2000 and did not suffer from multiple severe impairments prior to this time, lends support to plaintiff's position prior to that date last insured. Based on the pre-December, 2000 medical opinions that plaintiff could not return to work for much of this period, and the post-2005 finding that plaintiff was disabled, as well as the lack of intervening circumstance showing a different cause for plaintiff's disability, this court has no choice but to conclude that plaintiff was disabled prior to December 31, 2000. The court finds no reason to apply the grids or obtain vocational testimony, as the ALJ's reasoning in regard to the post-2005 period applies equally to the pre-2001 period.

CONCLUSION

Accordingly, the court finds the ALJ's assessment is not supported by substantial evidence in the record or based on the proper legal standards in regard to plaintiff's disability between July 27, 2000 and January 5, 2005, for which plaintiff should be granted benefits.

IT IS HEREBY ORDERED that: Plaintiff's Motion for Summary Judgment is granted, the Commissioner's Cross Motion for Summary Judgment is denied, this case be

remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for a computation of benefits, and the Clerk of Court is directed to enter final judgment.

DATED: 3/6/07

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Wert2100.ss.wpd